**UNITED STATES of America, Plaintiff—Appellee,**

v.

**Dionicio TORRES–ALVAREZ, Defendant—Appellant.**

No. 00–50506.

D.C. No. CR–99–00022–RT–02.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 2, 2002.

Decided Aug. 16, 2002.

Weiner, District Judge, dissented and filed a separate opinion.

Before HAWKINS and FISHER, Circuit Judges, and WEINER,* District Judge.

### MEMORANDUM **

We have reviewed this case carefully and determined that the government's case is insufficient as a matter of law to sustain the conviction of Dionicio Torres–Alvarez ("Torres"). The entirety of the evidence against Torres is this: First, drug dealer Uribe had paged Torres on a number of occasions contemporaneous with Uribe's efforts to find a drug supplier

---

* Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36–3.

for undercover agent Pagel. (Uribe, however, never mentioned the name of the supplier to Pagel and described his "source" as someone who had been in a recent car accident injuring his leg, which quite simply did not describe Torres.) Second, Torres was in the vicinity of the February 11, 1999 transaction—though he was not observed exchanging anything at either of the two encounters with Uribe (or anyone else).[1]  Finally, after his arrest, Torres initially said he did not remember who Uribe was, but once Uribe's name was put in the context of the lunch with his friend Sevilla, he did remember him. On these thin reeds, the government seeks to sustain a felony conviction and a lengthy prison sentence for a person with no prior criminal convictions.

The case against Torres is especially worrisome because there was evidence that the drugs belonged to someone other than Torres-evidence the jury was not permitted to hear. We therefore reverse and remand for entry of a judgment of acquittal on the grounds that the evidence was insufficient as a matter of law to support a guilty verdict on either conspiracy or possession. *See United States v. Vasquez–Chan,* 978 F.2d 546, 554 n. 4 (9th Cir.1992).

Even if we were to conclude that the evidence was sufficient, we would conclude that the district court erred when it precluded Torres from presenting certain evidence. This argument concerns the hearsay statements of Julio Sevilla which Torres attempted to introduce as part of his defense. On August 4, 1999, Detective Alejandro Munoz of the Santa Ana Police Department executed a warrant for Sevilla's arrest on an unrelated murder charge at the Imperial County Sheriff's Department, in Imperial County, California. He transported Sevilla back to Santa Ana, California. While en route to Santa Ana, Sevilla told Detective Munoz that he was wanted by the DEA for selling heroin to a DEA agent. Sevilla said DEA agents had arrested his friend—Torres—for assisting in a narcotics transaction. Sevilla said that Torres had nothing to do with the sales and that Torres had never sold drugs to anyone. Sevilla added that the heroin was his and that he took full responsibility for the drug transaction.

During Torres's first trial, his counsel called Sevilla to testify as a witness but Sevilla exercised his right under the Fifth Amendment and refused to answer any questions. Torres then sought to elicit hearsay testimony from Detective Munoz regarding the statements made by Sevilla after Sevilla's arrest. The district court found Sevilla unavailable as a witness and determined that Sevilla's statement regarding the heroin transaction was a statement against penal interest. However, the district court would not permit the testimony of Detective Munoz, finding there were insufficient corroborating circumstances clearly indicating that the statement was trustworthy. The jury deadlocked.

During the second trial, Torres again sought to call Detective Munoz to elicit Sevilla's statements. The district court held that Sevilla was unavailable and reaffirmed its prior holding that there were insufficient corroborating circumstances clearly indicating that Sevilla's statements to Detective Munoz were trustworthy.

---

1. Torres's mere presence at the scene of the crime, all agree, is not enough to warrant a criminal conviction. *United States v. Gaskins,* 849 F.2d 454, 457 (9th Cir.1988) ("A defendant's mere presence at the scene of the crime and knowledge that a crime has/is being committed is not sufficient to establish that an accused aided and abetted the commission of the crime, unless you find beyond a reasonable doubt that he was a participant, and not a knowing spectator.").

The district court's ruling was made pursuant to Rule 804(b)(3) of the Federal Rules of Evidence which provides an exception to the hearsay rule for:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Torres argues that the district court's ruling, excluding the Sevilla hearsay because it was not established as clearly trustworthy based on corroborating circumstances, was an abuse of discretion.

■ Whether the district court correctly construed the hearsay rule is a question of law reviewable de novo. *United States v. Olafson*, 213 F.3d 435, 441 (9th Cir. 2000). The district court's decisions to admit evidence under exceptions to the hearsay rule are reviewed for an abuse of discretion. *Id.* Exclusion of evidence under the hearsay rule is also reviewed for an abuse of discretion. *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir.2000). We hold that the district court abused its discretion in excluding some of Sevilla's statements.

When a declaration against penal interest is offered to exculpate the defendant, three requirements must be satisfied:

(1) the declarant must be unavailable; (2) the statement must tend to subject the declarant to criminal liability such that a reasonable person in the declarant's position would not have made the statement unless he or she believed it to

be true; and (3) there must be corroborating circumstances which [clearly] indicate the trustworthiness of the statement.

*United States v. Nazemian*, 948 F.2d 522, 530 (9th Cir.1991). The parties do not dispute Sevilla's unavailability—he invoked his Fifth Amendment right not to testify. Whether Sevilla's statements meet the second requirement is less clear. We have held that "a statement that includes both incriminating declarations and corollary declarations that, taken alone, are not inculpatory of the declarant, must be separated and only that portion that is actually incriminating of the declarant admitted under the exception." *LaGrand v. Stewart*, 133 F.3d 1253, 1268 (9th Cir.1998) (construing Arizona's identical hearsay exception). However, we have also recognized that a statement may be both inculpatory and exculpatory at the same time and that the inculpatory and exculpatory portions may not be "practically separable." *See United States v. Paguio*, 114 F.3d 928, 933–34 (9th Cir.1997). In *Paguio*, we reversed the district court's exclusion of a father's statement that the entire fraudulent scheme was his idea and that his son had nothing to do with it. *Id.* at 935. We reasoned that an inculpatory statement in the form of, "I did it alone, not with X," is more likely to be true of X than, "I did it, but X is guiltier than I am," because the former represents an attempt "to accept undiluted responsibility." *Id.* at 934.

■ Here, some of Sevilla's statements were inculpatory but some were not. His statements that Torres had nothing to do with the drug sale and that Torres had never sold drugs to anyone did not "tend to expose [Sevilla] to criminal liability," and thus Rule 804(b)(3) does not apply. However, Sevilla's statements that the heroin was his and that he took full responsibility for the drug transaction solidly

inculpated Sevilla. *Nazemian*, 948 F.2d at 530. In addition, the statements "were not made in circumstances which have been found to cast doubt on reliability." *Id.* Sevilla made the statements in custody, but the record does not reflect that he was trying to "curry favor" with the police or that his statements were an attempt to "shift blame from himself to others." *Id.* It does not appear that Sevilla could have suppressed the statements at any subsequent criminal proceedings. *Compare United States v. Hoyos*, 573 F.2d 1111, 1115 (9th Cir.1978) (affirming exclusion of exculpatory statement where it was made to wife and could have been suppressed on grounds of marital privilege). Moreover, although the government contends that Sevilla's statement is untrustworthy because he was already facing a long prison sentence for an unrelated murder charge, it does not supply us with any specific information about the strength of the case against Sevilla or even suggest that Sevilla knew at the time he spoke that he was in danger of serving time for that crime. In any event, a federal drug crime may well carry a sentence consecutive to the unrelated state murder charge. *Cf.* U.S.S.G. § 5G1.3 (Nov. 1, 2001). It is true that Sevilla and Torres were friends, but in *Paguio* we approved the admission of a statement exculpating the declarant's son. On balance, we conclude that the statement exposed Sevilla to criminal liability "such that a reasonable person in [Sevilla's] position would not have made the statement unless he ... believed it to be true." *Nazemian*, 948 F.2d at 530.

■ Finally, corroborating circumstances clearly indicate the trustworthiness of Sevilla's statement. Factors relevant to this inquiry include:

(a) the time of the declaration and the party to whom it was made;

(b) the existence of corroborating evidence;

(c) the extent to which the declaration is really against the declarant's penal interest; and

(d) the availability of the declarant as a witness.

*United States v. Oropeza*, 564 F.2d 316, 325 (9th Cir.1977). Sevilla made the statements six months after the drug transaction and about two months after the first of the conspirators was arrested. This weighs slightly against the trustworthiness of the statements, but the existence of corroborating evidence weighs more in favor of admission. Sevilla was present at the drug deal, and the evidence against him—his presence coupled with his confession—is nearly as strong as the evidence against Torres—his presence and the pattern of suspicious pages. *Compare United States v. Guillette*, 547 F.2d 743, 754 (2d Cir.1976) (affirming exclusion of statement against penal interest where no independent evidence tied the declarant to the crime). Moreover, as discussed above, the statements were clearly inculpatory of Sevilla. Finally, no one disputes that Sevilla was unavailable. Apparently, this weighs against admission,[2] but, given the "solidly inculpatory" nature of the statements and Sevilla's presence at the drug deal, we conclude that "corroborating circumstances clearly indicate the trustworthiness of the statement[s]." Fed. R. Ev. 804(b)(3). Accordingly, the district court

---

2. Even though Rule 804 *requires* that the declarant be unavailable to testify, *Guillette* suggests that unavailability weighs against admission of the hearsay statement. *See* 547 F.2d at 754 (noting concern that declarant could not be cross-examined or observed first-hand by the jury); *see also United States v. Rhodes*, 713 F.2d 463, 473 (9th Cir.1983) (suggesting that hearsay statement was unreliable because, *inter alia*, declarant became unavailable because he decided to invoke his Fifth Amendment right not to testify).

abused its discretion in excluding Sevilla's inculpatory statements—that the drugs were his and that he took "sole responsibility" for the transaction. Moreover, given the slim evidence against Torres, we cannot conclude that the error was harmless beyond a reasonable doubt.

Though it is our practice to slice and parse through the moments of a man's trial, it is signally important—vitally so when a man's liberty and reputation is at stake—to look at the whole narrative being told. The dissent's position does not see any connection between the claim that the evidence produced against Torres was paper thin and the claim that Sevilla's statements (whether all or some of them) were wrongfully excluded. This is a mistake because had Sevilla's statements been introduced, it would have been unreasonable for any fact-finder to conclude from all the evidence that Torres was guilty beyond a reasonable doubt.

**REVERSED.**

WEINER, District Judge, Dissenting.

I respectfully dissent from the majority's view that the evidence was insufficient as a matter of law to sustain the conviction. Torres was not merely present at the scene of the crime, the crime waited for him to arrive.

Our role is to view the evidence at trial in the light most favorable to the government to determine whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). While we all agree that the evidence established that on February 11, 1999, Uribe sold 124 grams of heroin to Pagel and that Torres was "in the vicinity," we part company over the issue of whether the deal was made at Torres' direction. The majority ignores the key evidence that tied Torres

to the crime: the sequence of pager messages between Uribe and Torres.

Two weeks before the sale, on January 27, 1999, Uribe offered to sell cocaine to Pagel. Pagel, however, asked Uribe for methamphetamine or heroin. Uribe responded that he would have to "check with his supplier." At 3:41 p.m. that afternoon, Uribe called defendant Torres' pager. Uribe paged Torres again at 4:36 p.m. on January 27, and three times on January 28, 1999. On January 30, 1999, Uribe began paging Pagel. He tried to reach him by pager six times between 5:00 p.m. and 9:52 p.m. Pagel did not return the call until the following day at approximately 3:05 p.m. During this conversation, Pagel told Uribe he was interested in receiving a sample of heroin and methamphetamine. Uribe informed Pagel that "he would have to check and get back" with him. The next day, February 2, 1999, Uribe paged Torres 10 times; on February 3, 1999, Uribe paged Torres twice in the morning, and then Uribe began to page Pagel.

Uribe finally spoke with Pagel at approximately 11:00 a.m. on February 3rd. Uribe told Pagel that he had located a source of heroin and methamphetamine. Pagel and Uribe agreed to meet that day at the Carl's Junior restaurant located off the Green River Road exit of the 91 Freeway in Corona, California. At approximately 1:30 p.m., in response to a page, Pagel called Uribe, who confirmed that he would meet Pagel at the Carl's Junior restaurant in an hour. Uribe and co-defendant Summers arrived at the restaurant in a brown truck. Pagel walked over to the truck, stood near the passenger side of the vehicle, and Uribe gave Pagel a sample of heroin.

Pagel next spoke with Uribe on the afternoon of February 9, 1999. Uribe asked Pagel if his people were interested in purchasing the heroin. Pagel responded that he wanted to purchase ten "pieces" of the

heroin.[1] Uribe said he would let Pagel know whether or not Uribe could obtain the ten pieces. Uribe paged Torres at 4:28 p.m., and then paged Pagel two minutes later. Pagel, however, did not return the page.

The next day, on February 10, 1999, Uribe again paged Pagel. At approximately 1:25 p.m., Pagel called Uribe back and told him that the money for the heroin would arrive the following day or the day after. Uribe told Pagel to let him know as soon as the money arrived. Uribe then paged Torres at 3:53 p.m.

On February 11, 1999, at approximately 10:30 a.m., Pagel called Uribe and told him that the "buyers" were coming from Las Vegas, Nevada, but that they only wanted five pieces of heroin instead of ten. Uribe responded that "he was going to have to check with him," apparently referring to his heroin supplier. Pagel proposed paying between $4,250 and $4,500 for the five pieces of heroin. Uribe again responded that he would "have to see what he says." Pagel told Uribe that if Uribe's supplier agreed to the price of $900 per piece of heroin, Uribe should page Pagel and leave the code "999." Immediately following this conversation, at 10:48 a.m., Uribe paged Torres. Then, at 11:05 a.m., Uribe paged Pagel and left the code "999 999."

Pagel and Uribe spoke again at approximately 12:30 p.m. and confirmed that the transaction would take place that afternoon at the same Carl's Junior restaurant where Uribe had delivered the heroin sample on February 3, 1999. Immediately after this conversation, at 12:32 p.m., Uribe again paged Torres.

Pagel arrived at the Carl's Junior restaurant about an hour after he spoke with Uribe. Between 1:15 p.m. and 1:30 p.m.,

Uribe and co-defendant Summers exited the 91 Freeway at Green River Road in Corona, California. Instead of meeting with Pagel, however, they drove past the Carl's Junior restaurant and waited at an adjacent Jack–in–the–Box restaurant. Uribe and Summers exited the truck and Summers entered the Jack–in–the–Box restaurant. A minute or two later, Summers exited the restaurant and both he and Uribe got back in their truck and waited for approximately 30 minutes. They then departed the Jack–in–the–Box restaurant parking lot and met with Pagel.

During this meeting, Uribe told Pagel that Uribe was "going to wait for [his] homeboy right here." Pagel asked Uribe if he had the heroin and Uribe responded that he was waiting for his "homeboy." Uribe and Summers then drove back to the parking lot of the Jack–in–the–Box and immediately exited onto the adjoining street. At that point, Torres and Julio Sevilla ("Sevilla") walked towards Uribe's truck. Torres, Uribe, and Sevilla stood near the rear of the truck for several minutes. Uribe and Summers then got back in the truck, and Torres and Sevilla walked into the Jack–in–the–Box restaurant. Uribe and Summers drove back to where Pagel was waiting and delivered the heroin. Pagel gave Uribe $4,500 in official government funds, which Uribe counted in front of Pagel and Summers. Uribe and Summers then drove back to the Jack–in–the–Box parking lot. As Uribe got out of the truck, Torres walked out alone from the Jack–in–the–Box and met with Uribe for approximately one minute. Thereafter, Uribe got back into the truck and drove off while Torres went back inside the Jack–in–the–Box.

The sequence of these events lead me to the inescapable conclusion that Torres was

---

1. One "piece" of heroin is the equivalent of approximately 25 grams. It was also referred

to by witnesses as a "Mexican ounce."

part of the heroin distribution conspiracy. Most telling is the evidence of Uribe's pager activity, showing he attempted to contact Torres each time some decision regarding the conspiracy had to be made. Uribe checked with Torres to see if he could obtain heroin, when Pagel asked for the sample, when Pagel asked for the ten pieces, and again when Pagel changed the quantity. When Uribe had to check with his supplier regarding the ten pieces, he paged Torres then paged back Pagel within two minutes with an answer. Finally, only after Torres arrived at the scene of the drug deal did the transaction actually take place. The evidence of Uribe's shuttling between the two parking lots was sufficient to discount Torres' explanation that the prior pager activity was to arrange for a car repair, and for the jury to reasonably conclude that Torres brought the heroin to the scene, gave it to Uribe, who brought it to Pagel, and then returned to give Torres the proceeds. The fact that Uribe met with only Torres after the deal gave the jury a reasonable basis to conclude that Torres, and not Sevilla, was Uribe's "homeboy."

Regarding the Sevilla hearsay, I believe the district court did not abuse its discretion when it excluded the entire hearsay statement because the circumstances under which it was made do not clearly indicate trustworthiness. There is very little Torres can point to in order to meet his burden under Fed. R. Evid. 804(b)(3). The only factor he cites is that Sevilla was present at the transaction. The countervailing factors cited by the government are that Sevilla and Torres are friends, and that Sevilla was facing lengthy incarceration for a murder charge, giving Sevilla a motive to confess to protect his friend, since Sevilla was going to be jailed anyway. The government also avers that Sevilla may have exculpated Torres in exchange for Torres not testifying against him in the murder case.

Under the abuse of discretion standard, a reviewing court should not reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *See United States v. Sherburne*, 249 F.3d 1121, 1125 (9th Cir.2001) (noting that reversal is appropriate only when reviewing court has a firm conviction that the district court committed a clear error of judgment); *Harman v. Apfel*, 211 F.3d 1172, 1174 (9th Cir.) (noting that reversal under the abuse of discretion standard is possible only "when the appellate court is convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances"), *cert. denied*, 531 U.S. 1038, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000). I do not agree that excluding the Sevilla hearsay was beyond the pale.

The abuse of discretion standard requires that an appellate court "uphold any district court determination that falls within a broad range of permissible conclusions." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 400, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990); *Security Farms v. International Bhd. of Teamsters*, 124 F.3d 999, 1016 (9th Cir.1997). Although the district court's reasons for excluding the hearsay are somewhat muddled, Sevilla's relationship with Torres and the government's inability to impeach Sevilla appear to have weighed heavily in the decision to exclude the hearsay. In addition, even exceptions to the hearsay rule are still subject to the ultimate relevancy test of Fed.R.Evid. 403, i.e. probative value versus prejudice. Had the district court excluded the hearsay on relevancy grounds, I would have no trouble finding no abuse of discretion, since the only way to avoid prejudice to the prosecution would have been to permit the government to conduct

a mini-trial of Sevilla's credibility, thus adding more tangential evidence.

Since we review for abuse of discretion, I think, ultimately, that we should not reverse merely because the district court was inarticulate where the record supports the ruling. I would thus conclude that excluding the statement was not error based upon the factor accepted by the district court: that the statement was not trustworthy because of Sevilla's relationship with Torres. Alternatively, I would find no abuse of discretion based on the government's Rule 403 argument.

Accordingly, I respectfully dissent from the majority's decision to upset a jury verdict that is eminently supportable on the record.